SAMUEL D. IRVIN, administrator, plaintiff in error, v. CREDITORS, of JAMES BOND, defendants in error.

(Atlanta, January Term, 1871.)

MARSHALLING ASSETS—DUTY OF ADMINISTRATORS.*— When a bill was filed by an administrator to marshall the assets of an

---

*MARSHALING ASSETS—DUTY OF ADMINISTRATOR.— To adjust the several claims of creditors, to avoid a multiplicity of suits, to marshal the assets of the insolvent estate, to protect the rights of all the creditors, and save himself from serious embarrassments and imminent danger of loss to him and his sureties, it was the duty and the right of the administrator to file the bill and settle the estate in equity. Code, § 3146; Macon, etc., R. Co. v. Parker, 9 Ga. 377; Walker v. Morris, 14 Ga. 323; Green v. Allen, 45 Ga. 205; Irvin v. Bond, 41 Ga. 630; Johnson v. Flanders, 65 Ga. 692.

insolvent estate, alleging that there were conflicting rights as to the distribution of the assets in his hands, and that the affairs of the estate were so complicated that he could not safely administer the same without the direction of the Court, and upon hearing the bill read, the Court, on its own motion, dismissed the same, for want of equity, and because the bill was multifarious:

*Held,* That the allegations contained in the complainant's bill made such a case as would authorize a Court of Equity to entertain it for the purpose of marshaling the assets of the estate and directing the administrator, as to the distribution thereof; that the remedies given by law for the protection of the administrator were not as adequate and complete, according to the statement of facts set forth in the record, as in a Court of Equity, and that it was error in the Court below to dismiss the complainant's bill.

Equity. Marshaling Assets. Multifariousness. Before Judge Johnson. Muscogee Superior Court. July, 1870.

When this cause was called below, the Court asked the counsel for Irvin, the administrator in this bill for marshaling assets and for direction, whether he was ready to proceed with the cause. He replied, that but two of the issues, to-wit: the claim of homestead by Mrs. Bond, and what amount she should have in lieu of dower, could then be tried; that the whole case was not ready for trial, because *complainant had certain suits pending, in and by which he expected to recover and thereby increase the assets. He proposed to try the said two issues and continue the balance of the cause. The Court refused to try the case by piecemeal and said he would examine the bill before passing upon the motion to continue. The Court then asked counsel for the defendant whether they had any motion to make and they said "no." The bill was then read to the Judge for his information. After hearing it, upon his own motion to make, and they said "no." The bill was then read to was multifarious.

This is assigned as error, upon the grounds that there was equity in the bill, the continuance should have been granted, and because the Court ought not to have dismissed the cause when defendant's counsel did not move to dismiss it.

The bill made this case, with a full exhibit of the papers, records, etc., therein alluded to: On or about the 24th day February, 1867, James Bond, of Spalding county, departed this life intestate, leaving a widow and two children, both minors, him surviving, as well as a considerable estate, both real and personal.

At the special instance and request of Bond, on the 26th day of June, 1867, Irvin took out letters of administration upon his estate and immediately assumed the management and control of said estate as such administrator, and so far as in his power lay, possessed himself of its assets, and took all necessary steps to make them available for the payment of its indebtedness; and by due notice in the "Macon Journal and Messenger," a public gazette, having an extensive circulation throughout the State, called upon all persons having demands against said estate to present them.

For a full and complete and accurate statement of the assets of said estate, at the time complainant entered upon the discharge of his duties, and assumed control of them as they appeared after a most thorough and laborious investigation, he refers to the exhibits attached, which he prays may be taken and considered as a part of this bill. Exhibits B and C contain inventory and appraisement, and schedule of notes and choses in action —the latter, whether in the hands of intestate *at his death, or of attorneys at law for collection and settlement.

Exhibit D is an application for leave to sell the lands of said estate, and order of the Court allowing the same, and contains all the real estate described in the appraisement, as well as all the other lands, designated as "wild" or "scattered lands," to which he could find and scrap of title in his intestate; whether consisting of a single deed or quit-claim, or of what appeared prima facie to be, a full chain from the State down to himself.

The legal title to lots thirty-six, forty-five, and the South half of forty-four, in the third district of Calhoun county—a small plantation of six hundred and twenty-five acres, in cultivation at the time of intestate's death—was in one James E. Janes, a brother-in-law of intestate, who acquired said title under the following cirrcumstances: Intestate some year or more previous to his death, sold and conveyed said lots, together with other property, to one Lamar Janes, son of David H. Janes, of the county of Randolph, for the sum of eight thousand dollars, taking his notes secured by mortgage, upon the premises. Before the period arrived, when, according to contract, intestate was to put said Lamar in possession, the latter notified him that it would not be·in his power to meet the payments. In order to get out of the dilemma in which he was placed, intestate commissioned said James E. Janes to get the contract with said Lamar rescinded, and furnished him with the notes and mortgage to accomplish that purpose. Said James E. Janes entered into negotiation with said Lamar, by proposing to take the trade off his hands, and the result was, the conveyance of said land by Lamar Janes to James E. Janes—the former receiving as the consideration for said conveyance the notes previously given to intestate—the latter being the mere agent of intestate in the transaction. These facts being well known to complainant, he felt it to be his duty to administer said lands, and promptly notified said James E. Janes, that he must either pay the amount due upon said Lamar Janes' notes, given in payment for said lands, or convey them to *complainant as administrator. Said James E. Janes being in Memphis, Tennessee, by letter accepted the latter alternative, and proposed to make a deed of quit-claim to complainant, upon his return to Georgia, which he expected to do in a short time. But very soon thereafter the said James E. Janes sickened and died, without having

Irvin v. Bond

executed said conveyance. Complainant, however, proceeded to administer said lands, as will appear from account sales number four—attached as part of Exhibit E—and attached to his deed conveying said lands, an affidavit of the facts as herein stated, together with the original letter of the said James E. Janes on the subject, for the protection of the purchaser at said sale.

The affairs of said estate are and have been greatly complicated, by a number of transactions with various parties, by said Bond, running through a period of some fifteen years previous to his death, in which large amounts were involved, Bond being known as an extensive dealer and trader in lands, negroes, and whatever else was on the market, subject to the contingencies of trade, speculation and the changes and fluctuations of the times. Though never an accurate business man—owing to his want of system and order—he was for the most part successful, though often embarrassed, without the fact being known, except to those intimately acquainted with his business transactions; his whole plans were deranged, and all the machinery of his operations thrown out of gear by the late war, which ended disastrously and rendered him bankrupt. It was this fact known to himself, but concealed from all others except complainant, which hastened his end.

Among other transactions, was one with Peter McLaren, now of the county of Dougherty, which took place in the year 1856. An agreement was entered into in New York, on the 16th day of September, 1856, between William W. Cheever, representing James Bond, and Peter McLaren, by which Bond agreed to sell to McLaren his plantation in the Second district of Dougherty county, containing seventeen hundred and fifty acres, known as the "Bond Place," (and one of *the best cotton plantations in that county,) for $15 00 per acre; $5,625 00 of the purchase-money was to be paid on the 1st day of January, 1857, $5,401 25, to be paid on the 1st day of April, 1857, and the balance, of $15,000 00, to be payable whenever Peter McLaren could sell a plantation he then owned, on the east side of Flint river, in the Ninth district of Baker county, at $10 00 per acre; and seven hundred and seventy acres, more or less, on west side of Flint river, at $10 00 per acre. Subsequently, and before the final consummation of the trade, Bond, not being fully satisfied with said agreement, and not disposed to ratify it, there was an arrangement made, by which he was to remove his hands to McLaren's place, on the east side of Flint river, in the Ninth district of Baker county, and cultivate and keep the same in repair until he could effect a sale—then, the amount of sale, at $10 00 per acre, was to be credited on McLaren's note for $15,000 00. Under this agreement, Bond surrendered to McLaren the possession of the plantation in the

Second district of Dougherty county, and transferred his lands and planting interest to said plantation of McLaren, in the Ninth district of Baker county. After cultivating said last named plantation for two years, Bond, with the full knowledge of McLaren, in the Fall of the year 1858, sold the same to L. G. Holloway, and John Lake, partners under the firm name of Holloway & Lake, of the State of South Carolina, who took possession of the same, and have, by themselves or those holding under them, been in its possession, use and occupation until the present time, and have paid in full the purchase-money for same except principal, $821 45, interest to 21st February, 1869, $460 00, making, in all, $1,281 45, which remains unpaid, and is still due the estate of intestate, for reasons which will hereafter more fully appear. After the sale of said plantation to Holloway & Lake, a disagreement took place between Bond and McLaren, which resulted in suit upon McLaren's notes. In the meantime, however, and before the bringing of said suits, McLaren had paid off the first note, falling due on the 1st day of January, 1857, for $5,625, and had made two payments on the second note for $5,401 25, viz: *one payment dated June 21st, 1858, of $1,200; the other, dated April 8th, 1859, of $2,000. The suits were brought by Lyon & Irvin, of Albany, Georgia, in whose hands said notes had been placed for collection, and did not come to an issue, until the war suspended all business in the Courts, and rendered their vigorous prosecution impossible. During the war, viz: in the year 1863, when all values were unsettled, an effort to compromise was made by the attorneys of intestate, and a compromise agreed upon by complainant, acting as attorney of James Bond, and the said Peter McLaren, by which said Peter McLaren agreed to make titles to the land on east side of Flint river, in the Ninth district of Baker county, to Holloway & Lake; to make titles to the seven hundred and seventy-five acres of land on west side of Flint river, to one Samuel P. Davis, then and now of the county of Baker, to whom complainant, as attorney of Bond, had bargained it, at the price of $10 00 per acre. He also agreed to pay up at once, in cash, the balance found to be due upon the $5,401 25 note, as well as interest then due upon one-half of the note for $15,000. Under this agreement, (which was not in writing,) to compromise and settle the whole matter in controversy, with full faith and confidence in said Peter McLaren, that he would carry it out and comply with it to the letter, and, in fact, with the express understanding in reference to a sale to Samuel P. Davis, complainant, at the attorney of said Bond, on the 4th day of July, 1863, closed a trade with said Samuel P. Davis, for the land on the west side of Flint river, at $10 per acre, taking said Davis' two notes for $3,850 each; one to become due on the 1st day October, 1863, and the other on the 1st day of

October, 1864; and, at the same time, gave said note of Peter McLaren credit for the amount, (upon his $15,000 conditional note,) viz: $7.775. Said Samuel P. Davis paid off and discharged the first note falling due, in Confederate money; the other, and last note, is still due and unpaid, for the reason that McLaren afterwards refused to make titles to said Davis, in compliance with the bond of intestate, bearing date July 4th, 1863, when the trade with Davis was consummated. Intestate has never *executed titles to Peter McLaren for the plantation in the Second district of Dougherty, further than to make out a deed and sign it, and place it in complainant's hand as an escrow, to be delivered only upon settlement of all matters in controversy. Complainant, as the attorney of said James Bond, made repeated efforts to close up and complete the settlement with said Peter McLaren, but always without success, until negotiations were suspended by the death of intestate. Since the qualification of complainant as administrator, he has filed his bill against said Peter McLaren, in Dougherty Superior Court, praying a rescission of the entire contract between him and intestate, upon the ground that said Peter has acted in bad faith in failing to comply—has repudiated the contract by refusing to comply with it, to the irreparable damage of intestate; the grounds of which it is unnecessary here to set forth, which is still pending and undetermined. To recapitulate, there is now due the estate, and dependent upon the issue of this litigation:

Amount interest upon McLaren's conditional note for
$15,000 00 about ........................................ $ 3,787 70
Amount due upon note, $5.401 25, about................ 8,665 58
Upon note of Holloway & Lake, principal and interest.... 1,281 45
Upon note of Samuel P. Davis, principal and interest..... 5,000 00

Total amount................................. $18,734 73

All of which is subject to the lien of said Richard F. Lyon and Samuel D. Irvin, as attorneys at law, for their fees, in prosecuting the same, and are referred to simply to show the exact condition of the estate present and prospective.

Complainant has commenced suit against the said Holloway & Lake by attachment, in Mitchell Superior Court, (they being non-residents of this State, and the lands sold being now in that county,) to recover the balance due upon the note, but no judgment can be obtained until the litigation with said Peter McLaren is ended, and their title perfected.

Complainant has commenced his action of complaint in Baker Superior Court, against Samuel P. Davis, judgment upon which will be delayed for the same reason. He may *also feel it to be due creditors of said estate to file a bill to rescind the contract with said Samuel P. Davis, because of the peculiar circumstances of the case, and to prevent the injustice of a defense which he learns he intends setting up, and which

he may be able to sustain in a Court of common law. His two notes cost intestate the full amount of their face, in Peter McLaren's note, made before the war, upon a gold basis; he has paid one in Confederate money when it was worth but one-thirteenth of gold value. He will now seek to show that the land is only worth $2 00 per acre, at present prices, and he having paid one-half the purchase-money, should only pay about one-seventh of the amount of the note still due. Rather than submit to such a verdict, would it not be better to rescind the contract, and pay him back the value of his Confederate money, and make him account for the rents and profits since its occupation by him, thus placing him and the estate in statu quo?

In January, 1859, intestate made a large trade with George W. Rowell, of the county of Baker, and others, by which he purchased and obtained possession of a large settlement of land in the seventh district of Baker county, including three distinct tracts:

1st. A plantation known as the Brooking place, containing about twelve hundred acres.

2d. The Lawrence G. Rowell place, containing about (750) seven hundred and fifty acres, for which he was to pay $6 50 per acre, without interest, whenever, and not until the titles to said tract should be made "perfect, clear and satisfactory." The reason for this stipulation was, because this contract was made with the heirs-at-law of Lawrence G. Rowell, whose estate was somewhat involved, and wholly unrepresented at the time.

3d. George W. Rowell's place, containing twelve hundred and fifty acres, at $10 00 per acre, to be paid for as follows, viz:

By the 5th day of February next thereafter................ $3,500 00
        By the 2d day of May, 1859....................... 1,500 00

*And the balance in two equal installments, payable on 1st January, 1860 and 1861. Some time subsequent thereto, the contract in reference to the latter place was changed in some particulars, not now recollected, on account of the embarrassments of the said George W. Rowell, and the liability of the land to seizure and sale, under certain judgments then existing against him. By this change, however, Bond, for his own protection, was forced to take up and get the control of certain fi. fas., here set out, as well as to pay off a lien of $1,000 00 to one James Baggs, of the county of Baker, which he held by virtue of a Coroner's deed, (Rowell being sheriff of the county,) to the land in question. During the year 1860 the title to the Brooking place was perfected to Bond, and then afterwards, previous to his death, full payment was made by him of the purchase-money due thereon.

Complainant's information is, that the title to the Lawrence G. Rowell place has never been perfected, and no pay-

Irvin v. Bond

ments made thereon; but in this, his information may not be correct. Isaac E. Bower, of the county of Decatur, is the present administrator on said Lawrence G. Rowell's estate.

The title to the George W. Rowell place has never been perfected. The said George W. Rowell departed this life some time in 1862 or 1863, and his estate is now represented by his widow, Mrs. Martha S. Rowell, administratrix, of the county of Baker.

The account of the estate of intestate, with the estate of the said George W. Rowell, at the present time, to his best information and belief, is about as follows, viz:

Rowell Estate, Cr.

By 1,250 acres land, at $10 00 ........................ $12,500 00

Dr.

To amount paid out at various times, on account of said lands, and fi. fas., paid off and taken control of, as follows, viz:

1859—September 7th—Paid by Lyon & Irvin, attorneys for James Bond, on the following fi. fas.:

639

| *Alfred H. Colquitt, Henry A. Tarver, and James Baggs, v. George W. Rowell. | Mortgage Fi. Fa. | |
|---|---|---|
| | Principal and interest paid..... | $965 06 |
| | Cost mortgage fi. fa. .......... | 20 50 |
| | Cost Common law fi. fa ....... | 11 75 |
| | | $997 31 |

There was a common law judgment and fi. fa., for same amount as above, founded upon same cause of action.

| Isaac E. Bower, v. George W. Rowell. | Amount paid, including principal, interest and cost.....$1,008 62 |
|---|---|
| Churchill, Walkley, and Johnson, v. George W. Rowell. | Amount paid—principal, interest and cost.............. $675 08 |
| Young, Atkins and Dunham, v. George W. Rowell. | Amount paid—principal, interest and cost, due upon this fi. fa. at date............. $486 71 |

Total amount paid on fi. fas. ............................$ 3,167 72
Interest on same 10 years, to 7th September, 1869 ......... 2,217 40
To cash paid James Baggs for you, by S. D. Irvin, attorney, October 20th, 1860 ................................... 1,000 00
To interest on same, to October 20th, 1869 ............. 630 00
To cash paid G. W. Rowell, by James Bond, as per receipt, dated December 16th, 1860 ........................... 700 00
To interest on same to December 16th, 1868 ............. 392 00

As appears from books of intestate as follows:

1860.
To rent of 179 acres of land, at $2 50 ..................... 447 50
To cash $100 00, cash $80 00, cash $291 00 ................ 471 00
To cash paid for pump-soled boots ..................... 7 50

1861.

| | |
|---|---:|
| To cash $75 00, paid Manly & Hodges for you, $30 99..... | 111 99 |
| Rent of 304 acres land, at $3 00.......................... | 912 00 |
| Corn furnished you by Walker.......................... | 187 00 |
| One pair medical bags................................... | 25 00 |
| 200 yards osnaburgs...................................... | 30 00 |
| 1862. | |
| January 4—To cash paid Mrs. Rowell..................... | 50 00 |
| Interest on last amounts from date of each.............. | |
| | $10,339 11 |

640    *Some time during the late war, in the year 1862 or 1863, intestate sold the George W. Rowell and the L. G. Rowell lands, to one William L. Walthour, then of the county of Liberty, but now of the county of Baker, (place of residence not positively known,) for a price unknown to complainant; but the information is, that he received pay for said places in Confederate money, or in Atlantic & Gulf Railroad stock, at Confederate prices, except the sum of $1,038 08, for which he held the note of said Walthour, bearing date 21st February, 1863, and due one day after date, and which said note is now in the hands of complainant, as administrator, due and unpaid. And complainant's information further is, that his intestate executed to said W. L. Walthour titles to said lands, with covenant of warranty.

And complainant is informed, and believes, that at the time this trade was consummated, intestate had every reason to believe, and did believe, that he could soon thereafter perfect the titles to said lands, as administration had been taken out upon said Lawrence G. Rowell's estate, and he had an abundance of the common currency of the country, with which to pay up the balance due by him thereon. There were some complications in the way of a settlement which rendered a resort to equity necessary, and intestate accordingly employed Isaac E. Bower, Esq., attorney at law, then of the county of Baker, to file a bill in Baker Superior Court, against Martha S. Rowell, administratrix of George W. Rowell and Thomas Allen, administrator de bonis non of L. S. Brooking, deceased, to perfect said titles. Said bill was filed to the May Term, 1863, of said Court, and the amount due was, by intestate, placed in the hands of said Isaac E. Bower, to be paid over when the necessary decree could be had in said case. But owing to the rapid depreciation in the currency, and the slow progress of the case, owing to the unfortunate condition of the country, said parties notified the attorney of intestate that the currency in his hands would not be received in payment of balance due. This caused a return of the amount in the hands of Isaac E. Bower to intestate, and a suspension of proceedings until a better currency 641    *was provided, and a state of affairs more favorable to the closing up and settlement of said business should dawn upon the country. And so the matter stood at the time of intestate's death, and so it remains still, said Martha S. Rowell, claiming

Irvin v. Bond

the balance due the estate of George W. Rowell, and said W. L. Walthour, clamorous for a perfect title to the lands of which he is in possession, and protection against the claim of said G. W. Rowell's estate, as against said lands. Complainant is unable to pay up the balance due the estate of Rowell, or to make good the warranty of his intestate to the said W. L. Walhour.

Among other items of indebtedness against this estate is a note, bearing date, February 21st, 1861, due one day after date, for the sum of $6,150 69, which is held by John C. Butler, of the county of Bibb, as administrator of Dr. M. A. Franklin, subject to two credits, one of $300 00, dated June 27th, 1862, the other for $3,000 00, dated some time thereafter. As collateral security for this note, complainant holds a note, of which the following is a true copy, viz:

"Bond's Mills, Baker County, Ga.,

$12,516.                              January 2d, 1860.

On the first of January, A. D., 1867, after date, we promise to pay to the order of Charles G. Gunter, twelve thousand five hundred and sixteen dollars, value received, payable at the Bank of Columbus, at Columbus, Georgia.

(Signed,)                     .      C. T. Gunter,
                                     D. C. McIntyre.
"Endorsed on back—C. G. Gunter,
              D. J. Bunting."

· Credited as follows on back of note: "Received, Columbus, April 4th, 1864, of C. T. Gunter, three thousand five hundred and fifty-nine dollars on this note—three thousand of which is principal, and five hundred and fifty-nine dollars is interest on the three thousand dollars for the time this note has to run before maturity."

Said note still belongs to estate of intestate, subject to the *claim of Franklin's administrator upon it, as collateral for the note of intestate, as aforesaid. John C. Butler had commenced suit against intestate upon the note first above described, previous to his death, and has served complainant with scire facias, with a view of obtaining a judgment against him upon said debt. And complainant charges, that unless said administrator, John C. Butler, can realize the sum due by intestate, upon said collateral in his hands, there are no assets in the hands of complainant out of which the same may be paid.

Among other complications in which he finds the estate of his intestate, is a debt due to William B. Parker, of the county of Bibb, and a liability to John Jones, of the county of Spalding, connected therewith, as follows, to-wit: The claim of William B. Parker is founded upon the following note, viz:

41 G R—33

$5,775.                          Macon, Ga., Sept. 17th, 1863.

On the 5th day of August, eighteen hundred and sixty-five, I promise to pay to the order of William B. Parker, fifty-seven hundred and seventy-five dollars, for value received, it being for three lots of lands in the 12th district of Miller county, numbers two hundred and three, two hundred and four and two hundred and eighty-three adjoining, and I guarantee said Parker against all delay, loss or expense in collecting this note.

(Signed)                                James Bond.

It seems that this note was given in renewal of other notes, which were given on the 5th day of August, 1858, when, according to said Parker's statement, said trade was first consummated, at which time Parker executed a bond, conditioned to make titles to said lots of land upon payment of said original notes. When the notes were renewed, and at the time said note for $5,775 00 was given, it seems that said Parker took up his bond, and executed a deed of conveyance to intestate, for said lots of land, and took from intestate a mortgage deed upon the land, to secure the payment of the *note. It further appears, from the statements of the said John Jones, that about the 1st day of September, 1863, said Bond executed a deed, conveying said lots, so bought from Parker, and one other, to said John Jones, for a consideration paid by said Jones in South-Western Railroad stock, which statement was verified by an exhibition of the deed of Bond to John Jones, which had been duly recorded in the proper office in Baker county. When complainant took possession of the papers of his intestate, he found among them the grants from the State of Georgia to William B. Parker, and deed of William B. Parker, bearing date 17th day of September, 1863, conveying said lots two hundred and three, two hundred and four and two hundred and thirty-three, in Twelfth district of Miller county, (which was a mistake, as said lots are situated in Baker county,) to James Bond. On receiving notice of said John Jones' claim to said lands, and being satisfied from an inspection of James Bond's deed to him that the title papers of right were his, he surrendered them to the said John Jones, on the twelfth day of August, 1867.

Said Parker has commenced proceedings to foreclose his said mortgage upon said lands, in the Superior Court of Baker county, and has also commenced his action of complaint against complainant, as administrator, in the Superior Court of Spalding county, to recover the amount due upon said note. For want of means, and claims of higher dignity against said estate, he can not pay either the note due the said Parker, or make good the warranty of his intestate to the said John Jones.

Among other demands against said estate, is the one in favor of John H. Newton, of Clark county, set out as Exhibit F; it being a note for $1,303 07, due March 13, 1865, which was

given for lot of land number sixty-two, in Eighth district of Baker county, upon which the said Newton holds a mortgage to secure said note, duly recorded in said county of Baker. And in equity and good conscience, and under the law of the State, said Newton should look to said lot of land alone for payment, and not to any of the assets of said estate.

William H. Stark, of the county of Chatham, in the year *1866, and before the death of said James Bond, obtained by judgment of foreclosure against said James Bond, in the Superior Court of Mitchell county, upon a mortgage deed, bearing date first day of January, 1863, upon lots of land numbers thirty-six and thirty-seven, in the Tenth district, number two hundred and sixty-three, in the Ninth district, and three hundred and forty-two, in the Eleventh district, of Mitchell county, given to secure the payment of a promissory note, bearing even date with said mortgage deed, wherein the said James Bond promised to pay said W. H. Stark, or orded, one year after the date thereof, $3,211 03, for value received.

There has been no sale of said lands under said judgment of foreclosure, and he is apprehensive of suit by said Stark against him, as administrator, to recover whatever amount may remain unpaid upon said mortgage debt, after sale of equity of redemption in said lands.

There is still pending and undetermined, in the Superior Court of Terrell county, a bill filed by Edmund T. Walker, of the county of Mitchell, against Jared Irwin, of said county, now deceased, and James Bond. This bill was filed to the November Term, 1859, and seeks to recover out of said James Bond the sum of $1,450 00, amount paid to Jared Irwin, (alleged to be the agent of said Bond,) for the purchase of lot of land, three hundred and thirty-nine, in the Eighth district of originally Early, then and now Mitchell county, to which the bill charges, Bond had no title, and that said Walker had been ousted from his possession under his purchase from Bond and Irwin by a superior paramount title in another person.

Mrs. Selah E. Bond, widow of said James Bond, notified him soon after his appointment as administrator, that she had elected to take her dower in the lands lying in Muscogee county, and a sum of money to be hers absolutely in lieu of dower in all the other lands of which intestate died seized and possessed. Accordingly, she made application to the Superior Court of said county, at the November Term, 1867, to have commissioners appointed to lay off and assign her *dower in said lands in Muscogee county. At the November Term, 1868, of said Court, said commissioners reported, and their report was made the judgment of the Court, assigning and setting apart to her, twelve acres of ground in the village of Wynton, on which is situated the residence of the said James Bond at the time of his death: also one-third of the value of a lot of land, containing sixty-nine acres,

lying about nine miles from the city of Columbus.  Commissioners appointed by the Ordinary, previous to his appointment and qualification as administrator, set apart to said widow and her two children, all the household and kitchen furniture for their use, and $3,000 00 in money, for their year's support, as provided by law.

And said Selah E. Bond, by application to the Ordinary of said county, in December, 1868, obtained an order, under authority of what is known as the "Homestead Exemption Act," of 1868, setting apart the premises upon which her dower had previously been assigned as a homestead; and in addition thereto an order, requiring complainant, as administrator, "to pay over to John W. Duer, Ordinary, for the use of said Selah E. Bond and children, the sum of $1,000 00 in specie, or its equivalent, out of money in the hands of said administrator, or when the same shall come to his hands, out of notes and choses in action belonging to said estate, the same being personal property, to be by his direction invested for the sole use and benefit of herself, and her said minor children."  Of which proceeding complainant had no notice whatever, until he received a certified copy of the same from the Hon. John W. Duer, accompanied with a demand for the $1,000 00 in specie, as provided in said order, which said demand he refused to comply with:

1st. Because he had no money in his hands, realized from notes or choses in action, belonging to said estate; and—

Secondly.  Because he thought said order was wholly unauthorized by law—that the law, known as the "Homestead Act," did not authorize such a proceeding, and that the judgment of the Court of Ordinary was of no binding force and effect, and would not protect him in the payment of said sum *of money.  And he presents said matter to this Court, and asks its direction in the premises, whether he shall pay out of the assets of said estate, when realized, said sum of money, in compliance with said order of the Court of Ordinary.

As administrator of said James Bond, he has used all possible diligence in endeavoring to realize from the assets of said estate; he has been unable to collect any of the notes by suit or otherwise, as most of the parties shown to be debtors are insolvent, dead, or the demands barred by the Statute of Limitataions; the litigation with Peter McLaren, and other cases connected therewith, has, so far, baffled his efforts, and that of his counsel, to bring it to a successful termination; the lands of the estate, scattered as they were, have yielded, comparatively, but a small sum.  The lands in Cherokee, Georgia, were held by a very doubtful and imperfect title, and were so scattered as not to authorize complainant, in the condition of monetary affairs in the country since his appointment, to employ a special agent to look after them,

Irvin v. Bond

nor did his own time permit his doing so in person. Accordingly, after due deliberation, and consideraton, he thought it to the interest of all parties concerned, to put them in the hands of a reliable and efficient real estate agent for sale. Accordingly, he employed George W. Adair, of Atlanta, who is known to be energetic, reliable and efficient, and after advertising the same for over thirty days, in the daily and weekly "Atlanta Intelligencer," a paper having the most extensive circulation in that section of the State, those lots which were not claimed, were put up at public outcry, and sold in Atlanta on the first Tuesday in March, 1868, with the result as set forth in Exhibit E. Some of said lots were claimed by other parties, as noted opposite their numbers in said exhibit, with possession long enough to hold the same under the law. And purchasers have notified him, since the sale, that numbers of the lots purchased by them were in adverse possession, with good chains of titles; but as he only sold the estate's interest, whatever it might be therein, with the distinct understanding that if the estate had no title the purchaser had no recourse on him, he has not incurred liability on account *thereof. As an evidence of the want of confidence in the value of lands, and the scarcity of money, he states that he had advertised the little farm in Calhoun county for sale, before the Court-house door in said county, on first Tuesday in January, 1868, and at the time and place appointed, could only get offered for same, $1 00 per acre, one-third cash, one-third in twelve months, and one-third in two years, with interest. He withdrew it from sale, and rented it for the year 1868, for one hundred and sixty dollars, ($160 00,) and again readvertised it for sale, on first Tuesday in November, 1868. On the last mentioned day, he could only get offered $2 00 per acre; but by postponing sale until first Tuesday in December, 1868, he finally sold it on that day for $3 00 per acre.

The titles to lands in lower Georgia were nearly all imperfect, many of them coming to intestate through Seymour R. Bonner, deceased, whose name is sufficient to throw doubt and discredit on any chain of title in that section, where many ejectment suits have been decided against them. Those lands were extensively advertised in the "Albany Tri-weekly News," and in the "Bainbridge Argus," and sold at public autcry, for $1,288 25.

The whole amount realized from the sale of lands belonging to said estate, or to which it had claim of title, exclusive of the Calhoun county farm, is the sum of three thousand and thirty-nine dollars and ninety-two cents, ($3,039 92); including the Calhoun county plantation, the sum of four thousand six hundred and sixty-four dollars and ninety-two cents, ($4,644 92,) and he presents this question to the Court, in connection therewith: Whether the widow of intes-

tate is entitled to any dower interest in said Calhoun county plantation, or the proceeds of sale of same, under the facts presented, the legal title being in James E. Janes, the agent or trustee of intestate at the time of his death.

Among other demands against said estate, is an account rendered by James Clark, now of the county of Terrell, for the sum of seven thousand five hundred and ninety dollars and ninety-six cents, ($7,590 96,) a good portion of which *he believes to be just. Said Clark is a very poor man, and as the same person is put down in schedule of assets, as debtor to estate on divers notes therein set forth, and as said account cannot be paid for want of assets, it is equitable that said notes should be set off against it, and that said notes should be considered as paid, particularly as said Clark is insolvent.

There are, also, in hand and included in the list of assets, particularly set out, three notes on C. B. Franklin, amounting to the sum of $657 78. Said Franklin is an heir-at-law of Dr. M. L. Franklin, of whose estate the said John C. Butler is administrator, and said notes were given for cash loaned, and were intended by the said C. B. Franklin and James Bond to be payments on said Franklin's interest in said Franklin estate note. Said Franklin is a non-resident of the State of Georgia; wherefore, he prays that said notes may be set off and allowed as payments upon said note of intestate, in the hands of John C. Butler.

Upon a private memorandum book of intestate was found an account against L. G. Janes, another creditor of intestate, whose demand against the said estate is set out, amounting to the sum of $5,184 00, composed of the following items, viz: *  *  * Which account he pleads as a set-off against the demand of the said L. G. Janes, and prays judgment against said Janes for the balance due thereon, after deducting the amount of his demand.

Two of the drafts of the said James Bond, accepted by William G. Porter & Company, of Apalachicola, Florida, viz: those dated March 21st, 1862, one for $400 00, and the other for $430 00, due at ninety days, were never used by said intestate, but were held and kept by intestate, to be returned to said acceptors, until his death, and after the qualification of this administrator, were found by him among the papers of said estate. Which said drafts, accepted as aforesaid, have been mislaid so that he cannot, at present, find them; but he avers the fact to be as herein stated, and that the said William G. Porter & Company cannot, in any contingency, be called upon by any other person for payment of said acceptances, and prays, that if said drafts, and acceptances *of the same by said parties can be and are found, he may return them to said acceptors, and if not found, that they may be established by

order of this Court, and allowed to said estate as credits and in satisfaction of so much of the account of said William G. Porter & Company.

C. P. Walker, then of the county of Calhoun, but now of the county of Terrell, combined and confederated with one Thomas J. Dunn, his attorney-at-law, now of the county of Calhoun, a short time previous to the death of intestate, viz: in the month of February, 1867, and, contriving how to injure and annoy the said James Bond, sued out numerous attachments, some returnable to Justices' Court, and one to the Superior Court of Calhoun county, alleging as a ground, and the only ground for the suing out of same, "that said James Bond was removing, or about to remove out of said county of Calhoun;" and caused said attachments to be levied upon ten bales of cotton, then on the plantation of said James Bond, in said county of Calhoun; which cotton was released from the levy of said attachments by said Bond previous to his death, by giving a replevy bond. Said cotton was shipped from said plantation to the warehouse of Hardeman & Sparks, Macon, Georgia, after its release from said attachments, and remained in said warehouse unsold, until after his appointment as administrator, when he sold the same, and has used the proceeds thereof in the due course of administration. The debt or demand of the said Walker, claimed to be due, and upon which said attachments were founded, consists of divers notes, all bearing date during the war, or between 1860 and 1865, and amounting, in the aggregate to about the sum of twelve hundred dollars, ($1,200.) The ground upon which said attachments issued was wholly untrue; so known to be by said Walker when the same were sued out, and they were sued out for the purpose of obtaining an unjust advantage of the said James Bond, and of his creditors, having claims of superior dignity; for said James Bond never had been a resident of the county of Calhoun, but was, at the time, and had been since the year 1856, a resident of the county of Muscogee, and was not subject to the *process of attachment in the county of Calhoun, upon the ground stated in said attachment, or upon any other ground, at the time, or any other time previous to his death. As the representative of said estate, he has been made a party defendant to said attachments, and forasmuch as the property levied upon has been administered by him and duly accounted for, and the claim of said C. P. Walker, if justly due, of inferior dignity to others against said estate, and his attachments unjustly and improperly sued out, it is not just or equitable that he should be compelled to litigate further with the said C. P. Walker in the county of Calhoun.

He appended a true statement of his account with the estate of his intestate, showing the amounts received and paid out up to the present time, and the balance on hand.

He has received the total sum of $7,891 68; has paid out, including commissions allowed him upon first return, $6,371 73. The balance in hand, at this date, is—

Cash, less commissions....................................... $1,519 95
Note of G. W. Colley, of Calhoun county, Georgia, due January 1st, 1870, with interest from date.................... 812 00

Total.............................................. $2,331 95

All of the creditors of said estate, so far as they have come to his knowledge, are residents of the counties set forth, except that Joseph E. Knowles and George W. Knowles reside in the State of Louisiana, and are represented by Lyon & Irvin, attorneys at law, of the county of Bibb; John Randolph Whitehead resides in the county of Miller; the residence of William H. Albert is unknown, but he is represented by James Johnson, attorney at law, of the county of Chatham, and Samuel Williams resides in the county of Terrell; all of whom are judgment-creditors of said estate; the notes set down in the schedule of indebtedness as Bryant Folsom's, of Lowndes county, are controlled by T. G. Turner, of the county of Brooks, whose attorneys are Peeples & Stewart, of the county of Spalding.

In consideration of the premises, and forasmuch as he is without remedy, according to the strict rules of the common *law, by reason of the large outstanding indebtedness of said estate, the numerous creditors thereof, the want of assets out of which they may be paid, the litigation now pending to recover and make available assets of said estate, the complicated condition of its affairs generally, the necessity of avoiding a multiplicity of suits, and to save expense, as well as to protect him by the judgment or decree of Court, in reference to the matters presented for its direction, he prayed for injunction against said creditors, etc., commanding and directing such of them as have already commenced actions, other than for foreclosure of mortgages, forthwith to desist from prosecuting their said actions against him, as administator, and such as have not commenced suit, to refrain from doing so, until the further order of Court; and for subpœna against each, commanding them to present their several and respective claims, and settle their several and respective priorities as to payment, out of such funds as may be in hand, upon the winding up and settlement of said estate; to answer such matters as may be necessary for them or either of them to make answer unto; and, finally, to stand to, abide and perform the final order or decree of the Court in the premises.

And for the Court, upon the hearing of this bill, to direct what amount he shall pay to the said Selah E. Bond, in lieu of dower, in the lands of said estate; whether he shall pay anything upon said order of the Court of Ordinary of Muscogee county, purporting to be passed under authority of

the "Homestead Exemption Act;" and what creditors are en-
·titled to priority of payment in the distribution of the assets
of said estate; and to allow him to amend this bill, from time
to time, as circumstances require, in order to show what assets
may have been realized upon, and the balance subject to dis-
tribution under the order of the Court; and to grant a reason-
able allowance for counsel fees and expenses, in bringing these
matters to a hearing; and upon a final hearing hereof, to grant '
a perpetual injunction against all the creditors of said estate,
and for general relief.

       Lyon, DeGraffenried & Irvin, for plaintiff in error.
652     *Fleming & Rutherford, Peeples & Stewart, Lanier
& Anderson, N. L. Howard, for defendants.

WARNER, J.

The allegations in the complainant's bill make such a case
as will authorize a Court of Equity to entertain it for the
purpose of marshaling the assets of the estate and directing
the administrator as to the distribution thereof. The remedies
provided by law for the protection of the administrator, under
the statement of facts set forth in the record, are not as ade-
quate and complete as in a Court of Equity, and it was error
in the Court below to dismiss the bill.

Let the judgment of the Court below be reversed.